UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES H., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:18 CV 73 JMB |
| | ) | |
| | ) | |
| ANDREW M. SAUL,[1] | ) | |
| Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before the Court pursuant to the Social Security Act, 42 U.S.C. §§ 401, *et seq.* ("the Act"). The Act authorizes judicial review of the final decision of the Social Security Administration denying Plaintiff James H.'s ("Plaintiff") application for disability benefits under Title II of the Social Security Act, see 42 U.S.C. §§ 401 et seq. and supplemental security income under Title XVI, see 42 U.S.C. §§ 1381 et seq. All matters are pending before the undersigned United States Magistrate Judge with the consent of the parties, pursuant to 28 U.S.C. § 636(c). Substantial evidence supports the Commissioner's decision, and therefore it is affirmed. See 42 U.S.C. § 405(g).

## I. Procedural History

On May 4, 2015, Plaintiff filed applications for disability benefits (Tr. 252-59), arguing that his disability began on April 9, 2015, as a result of depression, possible bipolar disorder,

---

[1] After the case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Deputy Commissioner Nancy A. Berryhill as the defendant in this suit.

heart condition, chest pains, and syncope.[2] (Tr. 150, 189) On September 29, 2015, Plaintiff's claims were denied upon initial consideration. (Tr. 180-86) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). Plaintiff appeared at the hearing (with counsel) on March 16, 2017, and testified concerning the nature of his disability, his functional limitations, and his past work. (Tr. 79-116) The ALJ also heard testimony from Dr. Michael McKeeman, a vocational expert ("VE"). (Tr. 107-14, 368-70) The VE opined as to Plaintiff's ability to secure other work in the national economy, based upon Plaintiff's functional limitations, age, and education. (Id.) After taking Plaintiff's testimony, considering the VE's testimony, and reviewing the evidence of record, the ALJ issued a decision on September 25, 2017, finding that Plaintiff was not disabled, and therefore denying benefits. (Tr. 7-23)

Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social Security Administration ("SSA"). (Tr. 1-5) On June 12, 2018, the Appeals Council denied review of Plaintiff's claims, making the September 25, 2017, decision of the ALJ the final decision of the Commissioner. Plaintiff has therefore exhausted his administrative remedies, and his appeal is properly before this Court. See 42 U.S.C. § 405(g).

In his brief to this Court, Plaintiff raises three related issues. First, Plaintiff challenges the weight the ALJ accorded to Carol Greening's opinions in her medical source statement as his

---

[2] Notably, Plaintiff did not list chronic obstructive pulmonary disease ("COPD") as a disabling impairment in his application or in his request for reconsideration. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (holding fact that claimant did not allege disabling condition in his application significant, even if evidence of the impairment is later developed). However, Plaintiff offered COPD as a basis for disability at his administrative hearing. Although the medical record indicates that Plaintiff has the diagnosis of COPD, disability is not determined merely by the presence of an impairment but by the effect that impairment has upon the individual's ability to perform substantial gainful activity. See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991).

treating board certified psychiatric nurse practitioner, and Dr. Adam Samaritoni's opinion in his medical source statement as his treating doctor. Next, Plaintiff argues that the ALJ's Residual Function Capacity ("RFC") determination is not supported by substantial evidence. The Commissioner filed a detailed brief in opposition.

As explained below, the Court has considered the entire record in this matter. Because the decision of the Commissioner is supported by substantial evidence, it will be affirmed.

## II.     **Third Party Statements** (Tr. 278, 302-09, 356-61)

The administrative record before this Court includes an undated "To Whom It May Concern" letter written[3] by the executive director of his last employer describing Plaintiff's employment as a cook. The letter generally described Plaintiff's past work as a cook, his problems at work, and the circumstances associated with Plaintiff quitting his job on April 9, 2015, three days before his alleged disability onset date. (Tr. 278)

The administrative record also contains third-party statements regarding Plaintiff's ability to do daily and work-related activities from Toni Hall, his wife, and from Carrie Hall, his sister-in-law. Carrie Hall stated that Plaintiff is not able to do anything due to his mental health problems and joint pain. Toni Hall indicated that Plaintiff cannot complete work or tasks due to his chronic obstructive pulmonary disease ("COPD"), and he cannot be around crowds of people due to his mental health. There is also a Function Report Adult – Third Party completed by Wayne Rodgers, Plaintiff's former brother-in-law, generally supporting Plaintiff's allegations of disability.

---

[3] Although the letter is undated, the ALJ's decision indicated that the letter was provided in March 2017, and related to events occurring on April 9, 2015.

**III**.    **Medical Records**

The administrative record before this Court includes medical records concerning Plaintiff's health treatment from April 15, 2014, through January 17, 2017. The Court has reviewed the entire record. The following is a summary of pertinent portions of the medical records relevant to the matters at issue in this case.

**A.    Clarity Healthcare – Carol Greening, APRN** (Tr. 530-55, 637-41)

Between January 22 and June 8, 2015, Nurse Carol Greening ("Nurse Greening"), a psychiatric nurse practitioner licensed by the State of Missouri, treated Plaintiff on five occasions and then again on January 17, 2017, at Clarity Healthcare. Nurse Greening completed a psychiatric diagnostic evaluation with medical services on the first visit and then medication management without psychotherapy on the following visits.

On January 22, 2015, Nurse Greening saw Plaintiff for a psychiatric evaluation to establish treatment. Plaintiff's chief complaint was "I really need to stay on my medicine." (Tr. 549) Plaintiff reported having a long history of psychiatric illness and being hospitalized in December 2014, for suicidal ideation. Plaintiff indicated that he was under a great deal of financial stress. Plaintiff reported that his mood was stabilizing, he had no further suicidal ideation, and his energy and motivation were improving. Mental status examination showed Plaintiff to be alert, oriented x3, and cooperative, and to have good hygiene, adequate concentration and attention, intact memory, adequate insight and judgment, and average intellectual functioning. Nurse Greening's diagnoses included major depressive disorder, antisocial personality (per history), and psychosocial/environmental problems. Nurse Greening continued Plaintiff's current medication regimen and explored coping strategies with Plaintiff.

In follow-up treatment on February18, 2015, Plaintiff complained of sleeping issues and

experiencing irritable mood at times. Plaintiff reported having a history of depression with depressed mood, low energy and motivation, difficulty with concentration, and previous symptoms of manic episode including talkativeness, racing thoughts, distractibility, difficulty finishing things, and increased socialization. During the fifteen-minute session, Nurse Greening found Plaintiff to be alert and oriented, cooperative, appropriate dress and grooming, and able to maintain appropriate eye contact with his speech spontaneous with normal rate and rhythm. Nurse Greening noted that Plaintiff had no psychotic symptoms; his thought process seemed to be rational, relevant, and goal-oriented; his concentration and attention were adequate; his memory intact; and his insight and judgment were adequate. Nurse Greening added the diagnosis of bipolar I depression and adjusted Plaintiff's medications.

Although Plaintiff was to follow up in a week, he next received treatment on March 16, 2015, and reported having a poor response to his medications. Plaintiff reported that his anger was under better control and sleeping through the night, and his motivation and energy were improved. Plaintiff indicated that he had been working in the yard, and he would return to work in a month. Nurse Greening observed Plaintiff to be alert and oriented x3 and cooperative, appropriate in his dress and grooming, and his mood more upbeat, his thought processes rational and memory intact, and insight and judgment were adequate. Nurse Greening adjusted his medications.

On May 19, 2015, Plaintiff reported having health issues including several periods of passing out and receiving treatment in the emergency room resulting in $9,000 hospital bill. Plaintiff reported sleeping well, experiencing financial stress, and having fairly stable mood but was mildly depressed. Plaintiff reported no side effects from his medication adjustment. Nurse Greening observed Plaintiff to be alert and oriented X3 and cooperative, appropriate in dress and

grooming, and to have depressed mood, adequate concentration and attention, memory intact, and adequate insight and judgment. Plaintiff reported experiencing periods of chest pain and passing out and continued smoking. Nurse Greening continued Plaintiff's medication regimen.

In follow-up treatment on June 8, 2015, Plaintiff reported his medication regimen made him more irritable. Plaintiff reported experiencing high stress due to his finances and lack of health insurance. Plaintiff indicated that he experienced some mood swings, mild depression, and sleeping problems. Nurse Greening observed Plaintiff to be alert and oriented x3 and cooperative, appropriate in his dress and grooming, rational thought processes and relevant and goal-oriented, adequate concentration and attention, and insight and judgment. Plaintiff reported having COPD and still smoking. Nurse Greening adjusted Plaintiff's medication regimen by adding Latuda.

Plaintiff returned on January 17, 2017, to transition his care from Hannibal Free Clinic after obtaining Medicaid. Plaintiff reported improvement in his health issues since using new inhalers. Plaintiff indicated that his energy and motivation were adequate. Plaintiff reported experiencing high stress because he cannot work and waiting for disability hearing. Plaintiff denied having any side effects from his medications. Plaintiff indicated that he had difficulty with impulse control especially when confronted by others. Nurse Greening observed Plaintiff's appearance to be within normal limits, and he was cooperative. Nurse Greening continued Plaintiff's medication regimen.

**B.** **Hannibal Free Clinic** (Tr. 565-70, 576-601, 608-22)

From March 24 to October 19, 2016, Plaintiff received treatment at the Hannibal Free Clinic.

In the March 24, 2016, Nurse Screening, Plaintiff listed COPD, bipolar, and depression

as his current medical issues and no current medications. Plaintiff explained that he had to stop his treatment with Nurse Greening due to his financial status.

On April 13, 2016, a nurse practitioner completed a psychiatric evaluation. Plaintiff reported having a long history of psychiatric illness and antisocial personality behavior, being hospitalized for suicidal ideation, and having low energy and motivation. Plaintiff indicated that he had been off his medications for a month and that Latuda effectively treated his symptoms. The nurse practitioner found his behavior to be appropriate and his attention/concentration was good. During a medication evaluation on May 18, 2016, Plaintiff reported that his mood was stable on his current dosage of Latuda and denied having any side effects. Plaintiff indicated that he had occasional mood swings caused by situational stressors. Mental status evaluation showed Plaintiff's mood was normal and his memory good.

On July 13, 2016, Plaintiff reported doing fairly well and not having any severe mood swings. The nurse practitioner found Plaintiff's mood was stable and prescribed Latuda.

During follow-up treatment on September 14, 2016, Plaintiff denied having any severe mood swings and any side effects from his medications. On October 19, 2016, Plaintiff reported that Latuda had been effective in treating his mood swings but he had experienced some new stressors such as transmission failure and lost cell phone. The treating doctor found Plaintiff's mood was stable and continued his medication regimen.

### C.    **Hannibal Regional Medical Group** (Tr. 572-75, 623-27)

From March 24 through December 14, 2016, Plaintiff received treatment with a nurse practitioner and Dr. Adam Samaritoni at Hannibal Regional Medical Group.

On March 24, 2016, Plaintiff received treatment for his COPD with a nurse practitioner. Plaintiff reported that his symptoms were moderate in severity and unchanged. Plaintiff

indicated that he had been experiencing difficulty breathing, shortness of breath, wheezing, and chest pain and he requested an inhaler. Plaintiff indicated that he is a heavy tobacco smoker and he no current medications. During treatment, Plaintiff was cooperative and well groomed. Plaintiff was diagnosed with bronchitis with COPD and prescribed an inhaler.

In treatment on August 11, 2016, Plaintiff returned "to go over his disability paper work for his COPD and Bipolar Depression." (Tr. 574) Chest and lung examination showed even and easy respiratory effort with normal breathing sounds and no wheezing. Dr. Samaritoni found Plaintiff to be alert and oriented x3 with appropriate judgment and insight and completed his disability paper work.

On November 14, 2016, Plaintiff returned to establish care after having been treated at the free clinic. Plaintiff reported being a current every day smoker. Dr. Samaritoni's chest and lung examination showed even and easy respiratory effort with normal breathing sounds and no wheezing. During follow-up treatment on December 14, 2016, Plaintiff reported that using the inhaler has helped. Chest and lung examination revealed quiet, even and easy respiratory effort, normal breath sounds, and no wheezes.

### D. <u>Hannibal Regional Hospital</u> (Tr. 383-529)

On April 15, 2014, Plaintiff received treatment in the emergency room at Hannibal Regional Hospital for nausea, vomiting, and epigastric pain. Plaintiff reported not having recent depression and no suicidal thoughts. Plaintiff reported being an every day smoker. Psychiatric examination showed no depression, memory loss, or suicidal ideas. Neurological examination showed no syncope. The treating doctor noted that his general appearance to be well-groomed and well-oriented. Although Plaintiff has a history of smoking, he reported no shortness of breath.

On June 13, 2014, Plaintiff presented in the emergency room complaining of right foot/ankle pain after stepping in a hole. Plaintiff reported not having recent depression or suicidal thoughts. Plaintiff reported being a current every day smoker, and he declined tobacco cessation education.

On April 15, 2015, Plaintiff received treatment in the emergency room for intermittent chest pain with syncopal episodes. Plaintiff reported being a current every day smoker, and he declined tobacco cessation education. The treating doctor observed Plaintiff's general appearance to be well-groomed. CT scans showed no visualized pulmonary artery filling defects and no acute thoracic aortic abnormality, and no findings of pulmonary embolus. An x-ray of his chest showed stable appearing bilateral pulmonary nodules and no evidence for acute infiltrate. Although the treating doctor recommended that Plaintiff stay in the hospital, Plaintiff declined and indicated that he would follow up with a cardiologist as an outpatient.

In a post hospital check on April 22, 2015, Dr. Richard Hu evaluated Plaintiff's syncope and noted that a Holter monitor evaluation showed that Plaintiff had some symptoms of dizziness and chest pain but no significant rhythm, conduction abnormality, unusual long pauses, or ventricular ectopies. Dr. Hu noted that Plaintiff's "description of problems appeared somewhat vague, not consistent." (Tr. 566) Dr. Hu found Plaintiff to be oriented to time, place, person, and cooperative. In his assessment, Dr. Hu listed recurrent syncope with no definite documentation and history of chest pain of uncertain nature.

**E.     Blessing Hospital** (Tr. 371-82)

On December 30, 2014, Plaintiff presented in the emergency room at Blessing Hospital complaining of depression and suicidal thoughts. Plaintiff reported antisocial personality traits and a long history of psychiatric disorder but he had never been hospitalized in a psychiatric

hospital. When he lost his medical insured status, he stopped taking his medications. Plaintiff explained that he has been under a lot of stress due to financial struggles. The treating doctor noted that, except for Lexapro and Abilify, Plaintiff has not taken any other medications. Plaintiff reported that he had not been taking prescribed psychiatric medications. The mental status examination showed Plaintiff to be cooperative, thought processes within the normal limits, his insight, judgment, and impulse control to be impaired, and his mood to be depressed. The treating doctor prescribed Prozac. Plaintiff's diagnoses included major depressive disorder, recurrent, severe without psychotic features, personality disorder with antisocial traits, and chronic mental illness with financial stressors. Plaintiff reported being a smoker. Neurological examination showed Plaintiff's attention span and concentration appeared to be normal. With treatment during his admission to the hospital, Plaintiff responded well to medication and his depression improved significantly and his suicidal thoughts completely disappeared by the time of his discharge on January 5, 2015.

## IV.    Opinion Evidence

### A.    Dr. Adam Samaritoni

On August 11, 2016, Dr. Samaritoni completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) ("MSS") in a checklist format and answered questions regarding Plaintiff's impairments. (Tr. 560-63) Dr. Samaritoni opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; sit about four hours; and stand or walk about two hours in an eight-hour workday. Dr. Samaritoni indicated that Plaintiff could sit and/or stand for 30 minutes before changing position, and he must walk around six to eight times for 10 minutes in an eight-hour workday and have the opportunity to shift at will. Next, Dr. Samaritoni indicated that Plaintiff would have to lie down three to four times during the workday. In

support of these limitations, Dr. Samaritoni listed "based on patient history" and his diagnosis of COPD. (Tr. 560) Dr. Samaritoni further opined that Plaintiff can never climb stairs or ladders. As to his manipulative functions, Dr. Samaritoni opined that Plaintiff can occasionally push/pull. As to environmental limitations, Dr. Samaritoni found Plaintiff should avoid concentrated exposure to perfumes, solvents/cleaners, and chemicals and avoid moderate exposure to extreme heat, high humidity, soldering fluxes, and fumes, odors, dusts, and gases. Next, Dr. Samaritoni noted that Plaintiff would miss more than four days of work each month; he would be off task 25% or more each workday; and he would need to take six to eight unscheduled breaks for 15 minutes during the workday.

### B. Nurse Carol Greening

On July 28, 2016, Nurse Greening completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) ("MSS") in a checklist format and answered questions regarding Plaintiff's impairments. Nurse Greening opined that Plaintiff has moderate to marked limitations in his ability to understand, remember, and carry out instructions affected by his impairment. In support, Nurse Greening noted that Plaintiff has bipolar disorder, difficulty focusing, and anger problems. Nurse Greening further opined that Plaintiff has moderate to extreme limitations in his ability to interact appropriately with supervisors, coworkers, and the public as well as responding to a routine work setting affected by his impairment. In support, Nurse Greening explained that Plaintiff has COPD causing problems breathing, a history of depression, a history of poor impulse control, and difficulty with decision making. Nurse Greening also noted that Plaintiff has been out of work for a year due to his cardiovascular disease, fainting episodes, and mood swings, and he has a history of suicide attempts. Next, Nurse Greening noted that Plaintiff would miss more than four days of work each month; he

would be off task 25% or more each workday; and he would need to rest every day for 30 minutes to an hour due to his anxiety and adverse effects of medications.

## V.  The Hearing Before the ALJ

The ALJ conducted a hearing on March 16, 2017. Plaintiff was present with an attorney and testified at the hearing. The VE also testified at the hearing.

### A.  Plaintiff's Testimony

Plaintiff began his testimony by noting that he only finished ninth grade. (Tr. 83)

Plaintiff testified that he last worked in 2015 as a cook and his job duties included lifting large commercial-size trays of food while standing. (Tr. 84) Plaintiff testified that he left the position after passing out on the job. (Tr. 92) Plaintiff indicated that he missed work two to three days a week and he had an attitude problem with the other employees. (Tr. 101) In the last six months of his employment, the operator of the facility counseled Plaintiff three times about his behavior and attitude. (Tr. 102) Most of 2012 and part of 2013, Plaintiff worked at a company making vinyl billboards, and his job duties included folding and packaging and regularly lifting 75 pounds while standing. (Tr. 85) Prior to that job, Plaintiff packaged trail mix bars and worked on his feet. Plaintiff testified that he also had worked on a production line trimming rubber products on a conveyor belt, and that job required him to stand. (Tr. 86) Plaintiff also worked on a hog farm, and his job duties included mixing feed and lifting fifty-pound feed bags and wrestling two hundred-pound pigs. (Tr. 86-87). Plaintiff also worked on an assembly line making brake line cables, and his job duties included lifting 25 pounds while standing. (Tr. 88-89) Before that job, Plaintiff worked as a lab clerk, and his job duties included lifting 75 pounds. (Tr. 89)

Plaintiff stated that his depression and bipolar disorder prevent him from working

because he cannot be around anyone. (Tr. 90, 95) Plaintiff explained that he cannot work due to his inability to concentrate. (Tr. 100) Plaintiff explained that he cannot control what he says. (Tr. 95) Plaintiff testified that he left his last job because of his depression, bipolar disorder, and COPD. (Tr. 90) Plaintiff explained that after he tried to shoot himself, he was placed on medical leave but his condition did not improve. (Tr. 92)

In a typical week, Plaintiff explained that he has four bad days where he either sleeps eight to ten hours during the day or hides in his bedroom. (Tr. 96) On good days, Plaintiff testified that he tries to clean the house, works in the yard, and shops. (Tr. 99)

Plaintiff testified that, in the last 24 hours, he had taken Latuda and Symbicort and used his rescue inhaler. Plaintiff testified that he receives treatment with a psychiatric nurse practitioner at the Hannibal Free Clinic. (Tr. 91) His physical problems include COPD and arthritis. (Tr. 104) Plaintiff testified that he elevates his legs above his waist for one to two hours, three to four times a week to alleviate his swelling. (Tr. 104-05) Plaintiff indicated that he could walk two blocks but then he would have to sit down for 15 to 20 minutes, and he has not stopped smoking. (Tr. 105) Plaintiff naps four times a day for one to two hours. (Tr. 106)

Plaintiff testified that nurse practitioner Carol Greening started treating him in February 2015, and Dr. Samaritoni started treating him in October 2015. (Tr. 106-07)

**B.**     **The VE's Testimony**

The ALJ asked the VE a series of hypothetical questions to determine whether someone Plaintiff's age, education, work experience, and specific functional limitations would be able to find a job in the local or national economy. (Tr. 109-12) The VE responded that such a hypothetical person would be able to perform medium exertional job duties, with certain limitations, such as a food service worker in a medical setting, a cleaner of laboratory equipment,

a meat slicer, and a raw shellfish preparer. (Tr. 111) Next, the ALJ asked whether the individual is off task 20% or more of the workday or missed two or more days a month would preclude employment. The VE indicated that such individual would not be able to maintain employment. (Tr. 112)

In response to counsel's question, the VE indicated that beyond the usual mid-morning, mid-afternoon, and lunch breaks, the individual could have an extra 2 to 3 minutes to go to the restroom each morning and afternoon, but if the individual went beyond those breaks, he would have trouble keeping a job. (Tr. 112) The VE acknowledged the most employment involves some interaction with supervisors and coworkers. (Tr. 113) The VE indicated that if the individual interacted inappropriately with supervisors, coworkers, and the public every workday by raising his voice, using foul language, and being argumentative, such individual would lose his job. (Tr. 113)

## VI.    **The ALJ's Decision**

In a decision dated September 25, 2017, the ALJ determined that Plaintiff was not disabled under the Social Security Act. (Tr. 10-23) The ALJ determined that Plaintiff had severe impairments of bipolar, major depressive disorder, antisocial personality disorder with antisocial personality traits, COPD, and arthritis. (Tr. 13) The ALJ determined that Plaintiff had the RFC to perform medium work with the following modifications: (1) he can never climb ladders, ropes, stairs, or scaffolds or be exposed to unprotected heights or hazardous work environments; (2) never climb stairs or ramps; (3) he can frequently balance and occasionally stoop, kneel, crouch, or crawl; (4) he can occasionally engage in tasks that require pushing or pulling over 10 pounds; (5) he is limited to remembering and carrying out simple routine tasks and making simple work related decisions; (6) he can have frequent contact with supervisors but

14

only occasional contact with coworkers and the general public; (7) he can have occasional exposure to extreme cold and should avoid moderate exposure to extreme heat, high humidity, and to fumes, dust, and other pulmonary irritants; and (8) he should be allowed to sit for up to 5 minutes on an hourly basis. (Tr. 15-16)

The ALJ concluded that Plaintiff could not return to his past relevant work. (Tr. 22) Based on hypothetical questions posed to the VE, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act because someone with his age, education and functional limitations could perform other work that existed in substantial numbers in the national economy. (Tr. 22)

The ALJ's decision is discussed in greater detail below in the context of the issues Plaintiff has raised in this matter.

## VII.   Standard of Review and Legal Framework

"To be eligible for … benefits, [Plaintiff] must prove that [he] is disabled …." Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); see also Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A plaintiff will be found to have a disability "only if [his] physical or mental impairment or impairments are of such severity that [he] is not only unable to do [her] previous work but cannot, considering [his] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled…. The ALJ consider[s] whether: (1) the claimant was employed; (2) [he] was severely impaired; (3) [his] impairment was, or was comparable to, a listed impairment; (4) [he] could perform past relevant work; and if not, (5) whether [he] could perform any other kind of work." Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)). See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id. Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1.    The credibility findings made by the ALJ.
2.    The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.
4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the claimant's impairments.
6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## VIII.    Analysis of Issue Presented

In his brief to this Court, Plaintiff challenges: (1) the weight the ALJ accorded to Nurse Greening's opinions in her MSS as his board certified psychiatric nurse practitioner, and Dr. Samaritoni's opinions in the MSS as his treating doctor; and (2) the ALJ's RFC determination.

### A.    Medical-Opinion Evidence

Although Plaintiff challenges the weight the ALJ accorded to the opinions of both Dr. Samaritoni and Nurse Greening, he focuses the majority of his arguments and analysis on the treatment of Nurse Greening's MSS.

#### 1. Nurse Carol Greening

Plaintiff challenges the weight the ALJ accorded to Nurse Greening's opinions in her

MSS without offering sufficient reason. The Court disagrees with Plaintiff's characterization of the ALJ's decision.

Between January 22 and June 8, 2015, Nurse Greening treated Plaintiff on five occasions and then again on January 17, 2017. His mental status examinations during this time period indicate a depressed mood but otherwise his mental health status was unremarkable. Nurse Greening diagnosed Plaintiff with major depressive disorder, antisocial personality disorder (per history), and psychosocial/environmental problems. Nurse Greening noted that Plaintiff experienced improvement with medication adjustments.

Based on his five office visits, Nurse Greening concluded that Plaintiff had moderate to marked limitations in his ability to understand, remember, and carry out instructions. In support, Nurse Greening noted that Plaintiff had bipolar disorder and anger problems, and he had difficulty focusing. Nurse Greening further opined that Plaintiff had moderate to extreme limitations in his ability to interact appropriately with supervisors, coworkers, and the public as well as responding to a routine work setting affected by his impairment. In support, Nurse Greening explained that Plaintiff has COPD, a history of depression, and poor impulse control, and difficulty with decision making. Next, Nurse Greening noted that Plaintiff would miss more than four days of work each month; he would be off task 25% or more each workday; and he would need to rest every day for 30 minutes to an hour due to his anxiety and adverse effects of medications.

The MSS provided by Nurse Greening must be evaluated as medical source information. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). Medical sources include nurse practitioners, physician assistants, licensed clinical workers, naturopaths, chiropractors, audiologists, and therapists. 20 C.F.R. 404.1513(d)(1). Opinions from other medical sources are important and

should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the record. Sloan, 499 F.3d at 888-89. In general, when weighing the opinion of another medical source, an ALJ should consider: the length of time and frequency of Plaintiff's visits with the source; the consistency of the source's opinion with other evidence; the evidence and explanations supporting the source's opinion; the source's specialty; and any other factors that tend to support or refute the opinion. SSR 06-03P. Information from these other sources cannot establish the existence of a medically determinable impairment but may provide evidence to show the severity of impairments and how they affect Plaintiff's ability to work. Sloan, 499 F.3d at 888. "[An] ALJ is permitted to discount such [other source] evidence if it is inconsistent with the evidence in the record." Lawson v. Colvin, 807 F.3d 962, 967 (8th Cir. 2015). Therefore, the ALJ was required to consider Nurse Greening's MSS in evaluation Plaintiff's impairments.

The ALJ gave Nurse Greening's opinions in the MSS limited weight, explaining that the "overall evidence of record, including the provider's own examination notes, does not support this extreme assessment." (Tr. 20) The ALJ also noted that "the record does not contain any psychological tests, work setting observations, or work evaluations that support [Plaintiff's] statements or assess [Plaintiff's] ability to complete tasks that are inconsistent with his having only moderate difficulties." (Tr. 14)[4] The ALJ found that Plaintiff's objective examinations documented mostly normal mental status reports. The objective medical records showed

---

[4] To the extent Plaintiff asserts that that the ALJ should have ordered a consultative examination to determine the impact of Plaintiff's impairments on his ability to work, the undersigned finds the record to be sufficiently developed. "[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (alteration in original) (citation omitted).

Plaintiff had experienced significant symptom improvement on Latuda, and that he had been maintained on that drug since June 2015, with no medication adjustments. The ALJ concluded that "it appears Ms. Greening relied heavily on the subjective report of symptoms and limitations provided by [Plaintiff]." (Tr. 21) The ALJ found that the limitations set forth in the MSS exceeded those supported in the record and therefore accorded Nurse Greening's opinions in the MSS limited weight.

Substantial evidence in the record supports the ALJ's assessment that Nurse Greening's opinions are inconsistent with the records of other providers. For example, Plaintiff started taking Latuda on June 8, 2015, but he did not seek treatment again until April 13, 2016. During treatment, Plaintiff indicated that Latuda effectively treated his symptoms and, the nurse practitioner found his behavior to be appropriate and his attention/concentration was good.

The ALJ stated that Nurse Greening's MSS with moderate to extreme impairments in numerous functional categories as a result of his mental impairments was inconsistent with her treatment notes that show normal objective mental status examinations. The ALJ also found the MSS inconsistent with Plaintiff's conservative pattern of treatment, focusing on improving his ability to cope with multiple situational stressors even when Plaintiff was not compliant with his medications.

Based on review of the record as a whole, the Court finds that the ALJ did not err in assigning limited weight to Nurse Greening's MSS. Nurse Greening's MSS contained substantial limitations that are not supported by Nurse Greening's treatment notes or other evidence in the record.

There is nothing in Nurse Greening's treatment notes that made any mention of the impact of Plaintiff's depression on his ability to engage in daily activities, to understand,

remember, and carry out instructions, or to interact appropriately with supervisors, coworkers, and the public. "A treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement." <u>Hamilton v. Astrue</u>, 518 F.3d 607, 610 (8th Cir. 2008); <u>see also</u> <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given to a treating physician's opinion is limited if the opinion consists only of conclusory statements). Moreover, checking a box on a form, without more, cannot amount to substantial evidence. <u>O'Leary v. Schweiker</u>, 710 F.2d 1334, 1341 (8th Cir. 1983) ("Because of the interpretive problems inherent in the use of forms such as the physical capacities checklist, our Court has held that while these forms are admissible, they are entitled to little weight and do not constitute substantial evidence on the record as a whole."); <u>see also</u> <u>Swigert v. Astrue</u>, 226 Fed.Appx. 628, 629 (8th Cir. 2007) ("A treating physician's checkmarks on an MSS form may be discounted if they are contradicted by other objective medical evidence in the record.").

Without any objective record in support, Nurse Greening checked that Plaintiff would miss over four days of work per month, be off task 25% of the time, and required frequent breaks to lie down for 15 minutes due to shortness of breath three to four times a day. As noted by the ALJ, these limitations are not supported by Nurse Greening's treatment notes and are refuted by the objective medical evidence which shows Plaintiff's COPD to be medically managed when he is compliant with treatment,[5] mostly normal mental status examinations during the relevant period, and maintenance on Latuda. Since restarting an inhaler in March 2016, Plaintiff had consistently reported improvement. Further, chest and lung examinations showed even and easy respiratory effort with normal breathing sounds and no wheezing. Moreover, limitations based on Plaintiff's COPD, a physical ailment, go beyond Nurse Greening's expertise as a mental-

---

[5] Plaintiff continued to be a heavy tobacco smoker, even though he has COPD.

health professional. See Wildman, 596 F.3d at 967 (holding that the ALJ could disregard consulting psychologist's RFC opinions because they were "largely based" on the claimant's physical ailments).

Even if Nurse Greening were an acceptable medical source, her six treatment notes would not support a finding that Plaintiff is disabled. Significantly, in her treatment notes, Nurse Greening never stated Plaintiff was unable to perform any work or that he was totally disabled. Nurse Greening consistently described Plaintiff as cooperative, with no evidence of irrational thought processes and displaying intact memory and adequate judgment and insight. Although adjustments were made to Plaintiff's medication regimen, the objective medical record showed Plaintiff has been successfully maintained on Latuda since June 2015, without any medication adjustments. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." Davidson v. Astrue, 578 F.3d 838, 843 (8th Cir. 2009) (holding that the ALJ permissibly gave non-controlling weight and "[non]significant" weight to a treating source opinion because of inconsistencies with the source's treatment notes); see also Martise, 641 F.3d at 918-19, 924-26 (affirming the ALJ's decision to give "less weight" to a treating source opinion based in part on the source opining that the claimant suffered from marked limitations in concentration when the source's treatment notes indicated that the claimant's concentration appeared intact).

Plaintiff has not established that the ALJ erred in assessing the weight to be afforded to the opinions of Nurse Greening.

### 2. Dr. Adam Samaritoni

The ALJ also accorded little weight to the opinion of Dr. Samaritoni's MSS. Plaintiff contends that the ALJ failed to offer sufficient reasons for discounting those opinions. The Court

disagrees with Plaintiff's characterization of the ALJ's decision.

As an initial matter, although he is described as Plaintiff's treating physician, Dr. Samaritoni only treated Plaintiff three times between August 11 and December 14, 2016. See 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treated source has treated [a claimant] and the more times [a claimant] has been seen by a treating source, the more weight [the ALJ] will give to the source's medical opinion.").[6]

"A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Reece v. Colvin, 834 F.3d 904, 908-09 (8th Cir. 2016) (internal quotations omitted). "Although a treating physician's opinion is usually entitled to great weight, it 'do[es] not automatically control, since the record must be evaluated as a whole.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)). "A treating physician's own inconsistency may undermine his opinion and diminish or eliminate the weight given his opinions." Milam v. Colvin, 794 F.3d 978, 983 (8th Cir. 2015) (internal quotations omitted). "Whether the ALJ gives

---

[6] Although there was a treatment note of a visit the day Dr. Samaritoni completed the MSS, this was the first time Dr. Samaritoni treated Plaintiff. The MSS was only a series of check marks to assess the functional limitations of Plaintiff with little or no explanation of the findings, no medical evidence or objective testing in support. A checklist format and conclusory opinions, even of a treating physician, are of limited evidentiary value. See Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010); Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The checklist format, generally, and incompleteness of the [RFC] assessments limit their evidentiary value."). Further, the MSS appears to have been procured by, and submitted to, Plaintiff's counsel. The MSS does not refer to any clinical tests or findings and was inconsistent with Dr. Samaritoni's treatment note that day.

the opinion of a treating physician great or little weight, the ALJ must give good reasons for doing so." Prosch, 201 F.3d at 1013 (citing 20 C.F.R. § 404.1527(d)(2)).

The record shows that Dr. Samaritoni completed Plaintiff's disability paperwork and the MSS on August 11, 2016. A review of the MSS shows that it was not based on objective testing. (Tr. 560-63) Based on the one office visit, Dr. Samaritoni concluded that Plaintiff could perform less than sedentary work "based on patient history" and his diagnosis of COPD. Dr. Samaritoni further opined that Plaintiff would have to lie down three to four times during the workday. Next, Dr. Samaritoni noted that Plaintiff would miss more than four days of work each month; he would be off task 25% or more each workday; and he would need to take six to eight unscheduled breaks for 15 minutes during the workday.

The ALJ accorded Dr. Samaritoni's MSS little weight noting that "it appears Dr. Samaritoni relied quiet heavily on the subjective report of symptoms and limitations provided by [Plaintiff], and seemed to uncritically accept as true most, if not all, of what [Plaintiff] reported." (Tr. 20) The ALJ further noted that "[a]lthough [Plaintiff] received ongoing treatment and has been prescribed medication for his COPD, the limitations set forth by Dr. Samaritoni greatly exceed those supported in the record." (Id.) Accordingly, the ALJ rejected Dr. Samaritoni's opinions as inconsistent with his own examination notes and the overall evidence of record, which documented mild exacerbation of COPD with no significant respiratory deficits and significant symptom improvement when using an inhaler as prescribed. See McCoy v. Astrue, 648 F.3d 605, 616-17 (8th Cir. 2011) (ALJ may reject a medical opinion if it is "inconsistent with the record as a whole" or "based, at least in part, on [the claimant's] self-reported symptoms" where the claimant is deemed not credible.).

The Court finds that the ALJ gave proper weight to the opinions of Dr. Samaritoni set

forth in the MSS and the questions answered. The ALJ afforded Dr. Samaritoni's opinions little weight because the severity of his limitations was not consistent with the objective evidence of record, his longitudinal medical history, observations by treating and non-treating sources, non-examining medical source opinions, and his daily activities. In assigning little weight to Dr. Samaritoni's MSS, the ALJ reasonably concluded that the MSS was inconsistent with the overall evidence of record. Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir. 1996) (treating source's opinions assigned less weight when the "opinions have largely been inconsistent and are not fully supported by the objective medical evidence).

"[O]ther evidence in the record also supports the ALJ's decision not to accord [Dr. Samaritoni's] opinion controlling weight." Reece, 834 F.3d at 910 (finding that "Commissioner gave good reasons for discounting" treating doctor's opinion where his findings were, *inter alia*, "highly inconsistent with the objective medical evidence in the record" and "other evidence in the record, such as [plaintiff]'s activities of daily living and [another doctor's] findings, did not support [the treating doctor]'s opinion and supported a much higher level of functioning than would be expected from someone with the limitations described in the [treating doctor]'s Medical Source Statement").

The medical record, including Dr. Samaritoni's own treatment notes, does not support of the physical limitations set out in his MSS. See Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012) (affirming ALJ's rejection of treating physician's opinions about plaintiff's exertional limitations that "[were] not reflected in any treatment notes or medical records."). Specifically, the ALJ noted that during treatment, examinations showed Plaintiff's COPD responded to medical treatment. The ALJ also noted that the medical record shows that Plaintiff has only required routine and conservative care and his providers have recommended such care. Overall,

the evidence shows that Plaintiff has had routine and conservative medical treatment limited to office visits and medication management. In fact, the evidence shows Plaintiff's symptoms improved with conservative medical treatment. Significantly, as reflected in his own treatment records, Dr. Samaritoni never imposed any functional limitations or work restrictions on Plaintiff. The objective testing revealed no functional limitations. Accordingly, the ALJ was justified in giving less than controlling weight to the conclusory opinions set forth in Dr. Samaritoni's MSS. Cline v. Colvin, 771 F.3d 1098, 1104 (8th Cir. 2014) (finding no error in decision to discount "cursory checklist statement" that include[d] significant impairments and limitations that are absent from [provider's] treatment notes and [plaintiff's] medical records"); Anderson, 696 F.3d at 793-94 (holding that "a conclusory checkbox form has little evidentiary value when it "cites no medical evidence, and provides little to no elaboration" and that it is proper for ALJ to discount a provider statement that "contained limitations that 'stand alone,' did not exist in the physician's treating notes, and were not corroborated through objective medical testing"). The ALJ properly offered a sufficient basis to give Dr. Samaritoni's opinions in the MSS little weight. See Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (finding error when the ALJ offered no basis to give an opinion non-substantial weight; "For example, the ALJ did not find the opinion inconsistent with the record or another [of the physician's own] opinion[s]."). Although the ALJ did not specifically address all of the non-controlling factors set forth in 20 C.F.R. §§ 404.1527(c), 416.927(c), the ALJ is not required to cite specifically to the regulations but need only clarify whether he discounted the opinion and why. Kientzy v. Colvin, 2016 WL 4011322, at *8 (E.D. Mo. July 27, 2016). In his decision, the ALJ outlined the treatment records from Dr. Samaritoni and other treating and examining doctors which did not

support the functional limitations in Dr. Samaritoni's MSS but showed routinely normal or otherwise objective testing results.

The undersigned notes that the limitations listed in the MSS were never mentioned in any physicians' treatment records or supported by any objective testing or reasoning. Because the objective record does not support the limitations in the opinions, the ALJ did not err if finding that any opinions were premised on Plaintiff's subjective complaints rather than the objective medical evidence. Furthermore, the ALJ properly discounted Plaintiff's subjective complaints, Wildman, 596 F.3d at 968, and Plaintiff does not take issue with that aspect of the ALJ's decision. Viewing the ALJ's opinion in light of the record as a whole, substantial evidence supports the ALJ's decision to assign little weight to Dr. Samaritoni's opinions. See Prosch, 201 F.3d at 1013 (internal inconsistency and conflict with other evidence on the record constitute good reasons to assign lesser weight to a treating physician's opinion). In the instant case, the ALJ sufficiently explained his reasons for giving Dr. Samaritoni's functional limitations in the MSS little weight as inconsistencies between the objective medical evidence. As outlined above, the objective medical evidence does not support the marked functional limitations in the MSS.

## B.  Residual Functional Capacity

Plaintiff argues that the ALJ's RFC is not supported by substantial evidence by the ALJ's failure to support the RFC findings with medical evidence.[7]

---

[7] Plaintiff notes that at step 5, the burden shifts to the Commissioner to show that Plaintiff is capable of performing other work. See Nevland v. Apfel, 204 F.3d 853 (8th Cir. 2000). To get to step 5, however, the ALJ must determine Plaintiff's RFC, and it is Plaintiff's burden to prove his RFC. Buford v. Colvin, 824 F.3d 793, 796-97 (8th Cir. 2016) (holding "[a]lthough it is the ALJ's responsibility to determine the claimant's RFC, the burden is on the claimant to establish his or her RFC").

A claimant's RFC is the most an individual can do despite the combined effects of his credible limitations. See 20 C.F.R. § 404.1545(a)(1). "The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.'" Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996)). An ALJ's RFC finding is based on all of the record evidence, the claimant's testimony regarding symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence. See Wildman, 596 F.3d at 969; see also 20 C.F.R. § 404.1545; SSR 96-8p (listing factors to be considered when assessing a claimant's RFC, including medical source statements, recorded observations, and "effects of symptoms … that are reasonably attributed to a medically determinable impairment") and 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."). The ALJ must explain her assessment of the RFC with specific references to the record. SSR 96-8 (the RFC assessment must cite "specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)" in describing how the evidence supports each conclusion). Throughout this inquiry, the burden of persuasion to prove disability and to demonstrate RFC is on the claimant. Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016). "In evaluating a claimant's RFC, an ALJ is not limited to considering medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." Id. (internal citation omitted).

The ALJ cited to medical records suggesting that Plaintiff's subjective complaints were inconsistent with the objective medical evidence. The ALJ found that Plaintiff had only moderate difficulties in interacting with others as he was able to cooperate with treatment providers and to interact with others and his children and his interpersonal relationships. The

ALJ also found that Plaintiff had only moderate limitations in his ability to maintain concentration, persistence, and pace, as his mental status examinations did not routinely demonstrate serious deficits or abnormalities in his attention, orientation, concentration, or cognitive functioning. The ALJ concluded that Plaintiff had the mental RFC to perform simple routine tasks and to make simple work-related decisions with only occasional contact with coworkers and the general public. This finding is supported by the evidence of record showing his cooperation with treatment providers and his demonstrated ability to interact with others and his children and his interpersonal relationships during the alleged period of disability. The objective medical record does not demonstrate the presence of greater limitations than those found by the ALJ. Thus, the ALJ's RFC finding is supported by substantial evidence on the records as a whole because "a reasonable mind would find [the evidence] adequate to support the Commissioner's conclusion." Ash v. Colvin, 812 F.3d 686, 689 (8th Cir. 2016) (citation omitted). Because the ALJ based her RFC assessment upon review of all the credible, relevant evidence of record, and the RFC is supported by some medical evidence, it will not be disturbed. See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). Substantial evidence supports the ALJ's finding that Plaintiff had the RFU to perform medium work with several limitations.

## IX.  Conclusion

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole. See Finch, 547 F.3d at 935. Similarly, the Court cannot say that the ALJ's determinations in this regard fall outside the available "zone of choice," defined by the record in this case. See Buckner, 646 F.3d at 556. For the reasons set

forth above, the Commissioner's decision denying benefits is affirmed. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of September, 2019.